# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LESLIE WEISE *et al.*,

    Plaintiffs,

     v.

GREGORY J. JENKINS *et al.*,

    Defendants.

Civil Action No. 07–1157 (CKK)

## MEMORANDUM OPINION
(July 13, 2011)

This action arises out of an incident on March 21, 2005, when Plaintiffs Leslie Weise and Alex Young were excluded from a public event in Denver, Colorado, where then-President George W. Bush was scheduled to give a speech on the topic of Social Security. According to Plaintiffs, officials acting under the authority of the White House Office of Presidential Advance ejected Plaintiffs from the event solely because they had arrived in a car that bore a bumper sticker carrying the slogan "No More Blood For Oil." Plaintiffs filed this action under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), seeking to remedy this alleged violation of their First Amendment rights. Defendants Gregory Jenkins and Todd Beyer are not the officials in Denver who actually ejected Plaintiffs from the event; rather, they are two former directors of the White House Office of Presidential Advance who are alleged to have created the policies that allegedly led to Plaintiffs' ejection. Plaintiffs therefore seek to hold Defendants liable for creating an unconstitutional policy.

Presently pending before the Court are Defendant Jenkins's [34] Motion to Dismiss or in the Alternative for Summary Judgment and Defendant Beyer's [33] Motion for Summary Judgment, which the Court shall treat as a motion to dismiss.[1]  Defendants contend that they are entitled to qualified immunity because they were not personally involved in the decision to remove Plaintiffs from the event and because the ejection did not violate Plaintiffs' clearly established constitutional rights.  Plaintiffs argue that the policy was clearly unconstitutional and that they are entitled to discovery regarding Defendants' involvement in creating it.  The Court declines to address Defendants' claims of qualified immunity, however, because the Court finds that the allegations in the Amended Complaint, considered together with the language of the challenged policy, fail to state a claim for relief that is plausible on its face.  Accordingly, the Court shall grant Defendants' motions and dismiss Plaintiffs' Amended Complaint.  The Court does not address the constitutionality of Defendants' actions or the actions of those who removed Plaintiffs from the event.

## I. BACKGROUND

*A.* *Factual Background*

The following facts are drawn from the allegations in the Amended Complaint, which the Court accepts as true for purposes of evaluating a motion to dismiss, *see Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).

---

[1] Although Defendant Beyer styled his motion as one for summary judgment, he concedes that is appropriate for the Court to treat it as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

1.    Weise and Young's Attendance at and Removal from a Presidential Event

On March 21, 2005, then-President George W. Bush held an event at the Wings Over the Rockies Air and Space Museum in Denver, Colorado, where he delivered a speech on the topic of Social Security. Am. Compl. ¶ 8. This speech was an official visit by the President, paid for by taxpayers and open to the public. *Id.* ¶ 9. On March 18, 2005, Plaintiffs Leslie Weise ("Weise") and Alex Young ("Young") separately obtained tickets to the event from the office of United States Representative Bob Beauprez. *Id.* ¶ 10.

Plaintiffs arrived at the event on March 21 in a vehicle owned and driven by Weise. Am. Compl. ¶ 11. Weise's vehicle displayed a bumper sticker with the slogan "No More Blood for Oil," which it is claimed could have been interpreted as an expression of opposition to the President's policies. *Id.* Plaintiffs allege that their purpose in attending the event was to listen to the President's views on Social Security and that they had no intention of disrupting the event. *Id.* ¶ 12. In addition, Young alleges that if the President had permitted questions from the floor, he would have sought to ask a question. *Id.* Neither Defendant has made any assertion that Plaintiffs intended to disrupt the event in any fashion, and Plaintiffs claim (without dispute from Defendants) that they did not engage in any action that could be considered disruptive. *Id.* ¶ 29.

Weise, accompanied by a friend, approached the metal detectors near the entrance to the event and was asked to show identification. Am. Compl. ¶ 13. Weise showed her identification, but the man guarding the entrance prohibited Weise and her friend from entering the event and directed them to stand aside next to a member of the White House Event Staff. *Id.* Young was screened by a different person and was permitted to pass through security; he then went inside and found a seat. *Id.* ¶ 14. Michael Casper ("Casper"), a member of the White House Event

Staff, told Weise that she had been "ID'd" and that she and her friend would be arrested if they had any ill intentions or if they tried any "funny stuff." *Id.* ¶ 16. Plaintiffs allege that Casper issued these threats and warnings solely because of the bumper sticker on Weise's car and his perception that Weise opposed the President's policies. *Id.* ¶ 17.

After Casper issued these warnings, he let Weise and her friend enter the event, and they proceeded to the area where the audience was seated. *Id.* ¶ 18. However, Casper then consulted with two full-time employees of the White House Office of Presidential Advance (one of whom was the Deputy Director of that office), and these employees told Casper to require Weise and Young to leave the event. *Id.* A few minutes later, Casper found both Young and Weise inside the event and told them to leave. *Id.* ¶ 19. Casper placed his hand on Young's back and shoved him forward toward the exit, and Weise followed Casper as he pushed Young toward the door. *Id.* Young repeatedly asked Casper who he was, where he was taking them, and what was going on. *Id.* Casper told them that it was a private event and that they needed to leave. *Id.*

Once outside the event, Weise and Young were left with a group of men. Am. Compl. ¶ 20. One of the men identified himself as a member of the Secret Service, and he told Weise and Young that if staff asked them to leave, they had to leave. *Id.* After the event, the Secret Service confirmed to Weise and Young that they were ejected from the event because of the bumper sticker on Weise's vehicle. *Id.* ¶ 21. Plaintiffs claim that the audience at the event included many individuals who were wearing political paraphernalia expressing support for the President and his policies, and none of them were asked to leave the event. *Id.* ¶ 22. Plaintiffs contend that their removal from the event deprived them of their First Amendment rights and caused them to suffer emotional distress. *Id.* ¶ 23.

2.    The White House Office of Presidential Advance Policies Regarding
      Attendance at Presidential Events

Planning for each official Presidential visit begins in the District of Columbia with the

White House Office of Presidential Advance ("Advance Office").  Am. Compl. ¶ 24.  Defendant

Jenkins was the Director of the Advance Office  from January 15, 2003 to November 30, 2004.

*Id.* ¶ 7.  Defendant Beyer later served in the same position and was Director of the Advance

Office at the time of the March 2005 incident.[2]  *Id.* ¶ 6.  Plaintiffs claim that the "policies

concerning attendance at the event were set by Defendants acting as federal officials" and that

"the ejection of the Plaintiffs was done at the direction of and pursuant to the policies adopted

and implemented by the Defendants."  *Id.* ¶ 25.  Plaintiffs allege that these policies are embodied

in the Presidential Advance Manual created by the Advance Office.  *Id.* ¶¶ 26-27.  Plaintiffs

allege that Defendants Jenkins and Beyer were responsible for promulgating and implementing

these policies while serving in their capacities as Directors of the Advance Office.  *Id.* ¶ 27.

The Presidential Advance Manual sets forth guidelines and policies to be followed by

Advance Office staff and others who are responsible for managing Presidential events.  *See* Pl.'s

Opp'n, Ex. 2 (Excerpts from Presidential Advance Manual, October 2002) (hereinafter,

"Advance Manual").[3]  The policies relevant to this case are described in Section V of the

---

[2] Plaintiffs do not plead the specific dates of Defendant Beyer's tenure at the Advance
Office, although Beyer states in an affidavit that he served as Director from January 2005 until
October 2007.  *See* Beyer Aff. ¶¶ 3-4.  The Court does not rely on this information in deciding
the pending motions.

[3] As explained in the declaration of Arthur B. Spitzer, Plaintiffs obtained a redacted copy
of the Advance Manual from the American Civil Liberties Union, which had obtained it in the
same redacted from via discovery in a prior civil action.  Spitzer Decl. ¶ 8.  The document had
been produced in response to a discovery request for "all documents concerning policies
governing audience member conduct or expression for any other official appearance by the

Advance Manual, titled "Crowd Raising and Ticket Distribution." *Id.* at 32.[4] The Manual states

that "[p]roper ticket distribution is vital to creating a well-balanced crowd and deterring potential

protestors from attending events." *Id.* at 32. The Manual then sets forth policies regarding how

ticket distribution will be coordinated by the Advance Office. *Id.* at 32-33.

The Manual also has a subsection specifically addressing the issue of demonstrators.

Under a heading captioned, "Preventing Demonstrators," the Advance Manual states in pertinent

part:

> As mentioned, all Presidential events must be ticketed or accessed by a name list.
> This is the best method for preventing demonstrators. People who are obviously
> going to try to disrupt the event can be denied entrance at least to the VIP area
> between the stage and the main camera platform. That does not mean that supporters
> without tickets cannot be given tickets at the door and gain entrance to the event. It
> is also <u>not</u> the responsibility of the Secret Service to check the tickets of the people
> entering. They are concerned whether the person is a threat physically to The
> President and not a heckler. It is important to have your volunteers at a checkpoint
> before the Magnetometers in order to stop a demonstrator from getting into the event.
> Look for signs they may be carrying, and if need be, have volunteers check for folded
> cloth signs that demonstrators may be bringing to the event.

Advance Manual at 34.

The Manual describes how to prepare for demonstrators by working with the Secret

Service and local police to "designate a protest area where demonstrators can be placed,

---

President." *Id.* The Court may consider the Advance Manual without treating Defendants'
motions as ones for summary judgment because it is referenced in the Amended Complaint and it
is integral to Plaintiffs' claims. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621,
624-25 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may
consider only the facts alleged in the complaint, any documents attached to or incorporated in the
complaint and matters of which we may take judicial notice."); *Kaempe v. Myers*, 367 F.3d 958,
965 (D.C. Cir. 2004) (noting that it is appropriate to consider documents whose authenticity is
not disputed where they are referenced in the complaint and integral to the plaintiff's claims).

[4] Other sections of the Advance Manual address topics such as the President's schedule,
dealing with the press, and hotel arrangements. *See* Advance Manual at 2.

preferably not in view of the event site or motorcade route." Advance Manual at 34. The

Manual also describes the use of "rally squads" as "a common way to prepare for demonstrators

by countering their message." *Id.* The Manual describes this tactic as "utilizing small groups of

volunteers to spread favorable messages using large hand held signs, placards, or perhaps a long

sheet banner, and placing them in strategic areas around the site." *Id.* The Manual explains:

> These squads should be instructed always to look for demonstrators. The rally
> squad's task is to use their signs and banners as shields between the demonstrators
> and the main press platform. If the demonstrators are yelling, rally squads can begin
> and lead supportive chants to drown out the protestors (USA!, USA!, USA!). As a
> last resort, security should remove the demonstrators from the event site. The rally
> squads can include, but are not limited to, college/young republican organizations,
> local athletic teams, and fraternities/sororities.

*Id.* at 34. The Manual advises that "[i]t is important for the Advance Team and all volunteers to

be on the lookout for potential demonstrators." Advance Manual at 34. It states that volunteers

should be instructed to contact the Advance Office person on site when they see demonstrators.

*Id.*

Finally, and importantly, the Advance Manual provides guidelines for "handling"

demonstrators:

> Once a group of demonstrators has been identified, the Advance person must decide
> what action to take. If it is determined that the media will not see or hear them and
> that they pose no potential disruption to the event, they can be ignored. On the other
> hand, if the group is carrying signs, trying to shout down the President, or has
> potential to cause some greater disruption to the event, action needs to be taken
> <u>immediately</u> to minimize the demonstrator's effect.

> Before reacting to demonstrators, the Advance person should inform the rest of the
> Advance Team, the Tour Director, and the Press Advance Director of the situation.
> Be prepared to give the number of demonstrators, location(s), a description, and their
> issue/organization.

If the demonstrators appear to be a security threat notify the Secret Service immediately. If demonstrators appear likely to cause only a political disruption, it is the Advance person's responsibility to take appropriate action. Rally squads should be dispatched to surround and drown out demonstrators immediately.

**Remember - <u>avoid physical contact with demonstrators!</u>** Most often, the demonstrators want a physical confrontation. Do not fall into their trap! Also, do not do anything or say anything that might result in physical harm to the demonstrators. Before taking action, the Advance person must decide if the solution would cause more negative publicity than if the demonstrators were simply left alone.

Advance Manual at 35.

Plaintiffs allege that they were treated as "demonstrators" or "protestors" pursuant to the policies in the Advance Manual. Plaintiffs claim that the Manual means "demonstrators" or "protestors" to include "anyone who expresses or is likely to express a viewpoint different from that of the President or critical of the President or of his policies." Am. Compl. ¶ 28. Plaintiffs allege that one of the Advance Office staff involved in excluding them from the event confirmed to the press that there was a national policy to exclude people whom the White House believed might disrupt an event. *Id.* ¶ 30. Plaintiffs contend that the Advance Office "equates anyone who expresses disagreement with the President's views as someone who might disrupt an event." *Id.*

Plaintiffs allege that other individuals have been similarly excluded or ejected from Presidential events because they expressed, or were thought likely to express, a viewpoint in disagreement with President Bush's views. Am. Compl. ¶ 31. For example, Plaintiffs allege that a ticket holder in line to hear the President speak in LaCrosse, Wisconsin wore a T-shirt critical of the President and was ejected by security officials. *Id.* Plaintiffs allege that several dozen individuals in Fargo, North Dakota, many of whom belonged to a liberal organization and had

publicly opposed the President's policies, were placed on a "do not admit" list and forbidden to attend a Presidential event. *Id.* Plaintiffs allege that a student in Tucson, Arizona was barred from a Presidential forum on Social Security because he was wearing a "Young Democrats" T-shirt. *Id.* And Plaintiffs allege that in Charleston, West Virginia, Jeffrey and Nicole Rank were arrested for peacefully wearing T-shirts that contained a message disagreeing with the President's policies at a public rally on the grounds of the State Capitol on July 4, 2004. *Id.* ¶¶ 32-33.

      B.     *Procedural Background*

Plaintiffs initially filed a lawsuit against Michael Casper and another individual involved in excluding them from the Presidential event in the United States District Court for the District of Colorado. *See Weise v. Casper*, No. 05-cv-2355 (D. Colo. filed Nov. 11, 2005). Plaintiffs alleged these officials violated their First and Fourth Amendment rights by ejecting them from the event on the basis of their viewpoint. Plaintiffs subsequently filed a similar suit against three additional defendants, all former employees of the Advance Office, including Defendant Jenkins. *See Weise v. Jenkins*, No. 07-cv-515 (D. Colo. filed Mar. 15, 2007). The cases were consolidated in the District of Colorado. Soon after filing suit against Jenkins in Colorado, Plaintiffs filed the present action against Jenkins in this Court, raising virtually identical allegations.[5] The Court stayed this action pending resolution of the consolidated cases pending in Colorado. Plaintiffs then filed their Amended Complaint in this action, adding claims against Defendant Beyer.

_____

[5] When Plaintiffs filed their initial Complaint on June 15, 2007, there were claims by two additional Plaintiffs, Jeffery and Nicole Rank. However, those plaintiffs voluntary dismissed their claims on August 28, 2007 in consideration of an anticipated payment of $80,000 from the United States. *See* [9] Notice of Dismissal with Prejudice as to Plaintiffs Jeffery and Nicole Rank.

On November 6, 2008, the District Court in Colorado held that it lacked personal jurisdiction over Defendant Jenkins. *See Weise v. Casper*, Civil Action No. 05-2355-WYD-CBS, 2008 WL 4838682, *2-4 (D. Colo. Nov. 6, 2008). That court also dismissed Plaintiffs' claims against two other defendants on the ground that there was no constitutional violation. *See id.* at *8. This Court then lifted the stay on the present action. Defendant Jenkins subsequently filed his Motion to Dismiss or in the Alternative for Summary Judgment, and Defendant Beyer filed his Motion for Summary Judgment. Both motions raised, among other arguments, the defense of qualified immunity. After these motions were fully briefed, the Court ordered the parties to submit supplemental briefing to address the question of whether the ruling by the District of Colorado in the consolidated cases had any preclusive effect on the issues to be decided by this Court. Shortly thereafter, the U.S. Court of Appeals for the Tenth Circuit affirmed the district court, holding that the defendants were entitled to qualified immunity because Plaintiffs' right not to be ejected from the Presidential event was not clearly established at the time of the alleged violation. *See Weise v. Casper*, 593 F.3d 1163 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 7. The District of Colorado court subsequently dismissed the claims against all remaining defendants. *See Weise v. Casper*, 2010 WL 3529546 (D. Colo. Sept. 2, 2010), *aff'd*, 2011 WL 2193359 (10th Cir. Jun. 7, 2011).

## II.  LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint need not contain "detailed factual allegations," but it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct.

1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In order to withstand a motion to dismiss, a complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Plausibility" does not mean "probability," but it does require more than mere *possibility* that a defendant has acted unlawfully. *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

The Supreme Court has outlined a two-prong approach for analyzing the sufficiency of a complaint:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 1950.

In evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff and accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also*

*Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged."). However, a plaintiff must provide more than just "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1950. Where the well-pleaded facts set forth in the complaint do not permit a court, drawing on its judicial experience and common sense, to infer more than the "mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Id.* at 1950.

When considering a motion to dismiss under Rule 12(b)(6), a court may only consider the facts alleged in the complaint, any documents attached as exhibits thereto (or incorporated therein), and matters subject to judicial notice in weighing the merits of the motion. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997). If matters outside the pleading are considered, a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6) must be treated as a motion for summary judgment. Fed. R. Civ. Proc. 12(d).

### III.  DISCUSSION

Plaintiffs bring this *Bivens* action against Defendants Jenkins and Beyer for damages and declaratory relief, claiming that Defendants violated Plaintiffs' First Amendment rights by establishing a viewpoint-discriminatory policy that caused them to be ejected from a Presidential event based on their apparent opposition to President Bush's policies. Defendants move to dismiss Plaintiffs' claims, asserting that they are entitled to qualified immunity because they were not personally involved in the alleged deprivation and because their conduct did not violate

Plaintiffs' clearly established constitutional rights.[6]  Defendants also contend that Plaintiffs have

failed to plead facts that plausibly show they can be held liable as policymakers.  The Court shall

address these issues below.

  A.  *Policymaking Liability Under* Bivens

  In *Bivens*, the Supreme Court "recognized for the first time an implied right of action for

damages against federal officers alleged to have violated a citizen's constitutional rights."  *Corr.*

*Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).  *Bivens* provides federal courts with "discretion

in some circumstances to create a remedy against federal officials for constitutional violations,

but [courts] must decline to exercise that discretion where 'special factors counsel[] hesitation' in

doing so."  *Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008) (quoting *Bivens*, 403 U.S. at

396).  Here, Plaintiffs allege that Defendants' policies targeted them for removal from a

Presidential event because they appeared to express a viewpoint critical of the President.  "[T]he

law is settled that as a general matter the First Amendment prohibits government officials from

subjecting an individual to retaliatory actions . . . for speaking out . . . . When the vengeful officer

is federal, he is subject to an action for damages on the authority of *Bivens*."  *Hartman v. Moore*,

---

[6] Defendants alternatively move for summary judgment, relying on declarations and other factual evidence to support their arguments.  Because Plaintiffs have requested the opportunity to engage in discovery to rebut Defendants' evidence, the Court declines to rule on Defendants' motions for summary judgment, and it need not reach them.

547 U.S. 250, 256 (2006) (internal citations omitted).[7]  "[A] *Bivens* action is the federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983."  *Id.* at 254 n.2.

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  *Ashcroft v. Iqbal*, 129 S. Ct. at 1948. "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Id.*  In this case, Plaintiffs seek to hold Defendants Jenkins and Beyer liable for creating unconstitutional policies that were applied by others to exclude them from the President's speech in Denver.  The D.C. Circuit explicitly addressed this kind of "policymaking liability" in *Haynesworth v. Miller*, 820 F.2d 1245, 1258 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006).[8]  As the *Haynesworth* court explained:

> Governmental officials may also be held personally liable in damages for constitutional infringements resulting from their establishment of unconstitutional policies. . . . [P]olicymaking liability rests upon the official's misfeasance rather than his nonfeasance.  For an official to be held accountable on this basis, he must actually prescribe policy–formally or de facto–that encourages improper means or ends.  To succeed on a policymaking theory, a plaintiff must demonstrate that the official against whom liability is asserted has the power—vested either formally or as a practical matter—to formulate policy, and has exercised that policymaking authority to generate improper practices.

[7] Although the Supreme Court has refused to extend *Bivens* to every context in which a federal official violates the First Amendment, *see Bush v. Lucas*, 462 U.S. 367 (1983) (rejecting *Bivens* remedies for violations by federal employers), courts within this circuit have generally recognized a *Bivens* remedy for private citizens who claim that their First Amendment rights have been violated by federal officers.  *See, e.g.*, *Oberwetter v. Hilliard*, 639 F.3d 545, 554 (D.C. Cir. 2011); *Lederman v. United States*, 291 F.3d 36, 40-41 (D.C. Cir. 2002).

[8] The Supreme Court ruled in *Hartman* that the plaintiff bears the burden of pleading and proving lack of probable cause in a *Bivens* action for retaliatory prosecution in violation of the First Amendment.  The D.C. Circuit had held in *Haynesworth* that there was no such requirement.  *See* 820 F.2d at 1255-57.

*Haynesworth*, 820 F.2d at 1264.

Therefore, to establish a claim for policymaking liability under *Bivens*, a plaintiff must show that the official (1) established a policy (2) that was unconstitutional and (3) caused the plaintiff to be injured. Defendants cannot be held liable simply for failing to change a preexisting policy, nor can they be held liable for the actions of others who misapply the policy that was actually adopted. Because they are only liable for their own misconduct, Plaintiffs must plead and ultimately prove that Defendants were personally involved as policymakers. *Iqbal*, 129 S. Ct. at 1949. Accordingly, the Court shall consider whether Plaintiffs have adequately stated a plausible claim for policymaking liability as the D.C. Circuit set out in *Haynesworth*.[9]

B.     *Plaintiffs' Allegations Regarding Their Ejection and the Connection to the Policies in the Advance Manual*

Plaintiffs' claims are based on "[t]he policy [that] is embodied in the Presidential Advance Manual created by and guiding the actions of the White House Office of Presidential Advance." Am. Compl. ¶ 27. Plaintiffs contend that Defendants should be held liable as policymakers because they were allegedly responsible for adopting the policies in the Advance Manual. The Court assumes *arguendo* that a policy aimed at excluding persons who express opposing viewpoints from public events would be unconstitutional. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[T]his Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . [i]t may not deny a benefit to a person on a basis that infringes his

---

[9] *Haynesworth* also sets forth a standard for determining when supervisory officials may be personally liable in damages for the unconstitutional acts of subordinates, *see* 820 F.2d at 1262, but Plaintiffs are not pursuing a claim based on supervisory liability, *see* Pls.' Opp'n at 32.

constitutionally protected interests—especially, his interest in freedom of speech."); *Weise v. Casper*, 131 S. Ct. 7 (2010) (Ginsburg, J., dissenting from denial of certiorari) ("I cannot see how reasonable public officials, or any staff or volunteers under their direction, could have viewed the bumper sticker as a permissible reason for depriving Weise and Young of access to the event."). However, the Advance Manual does not explicitly contain such a policy, and even if the language in the Advance Manual could be read to include such a policy, Plaintiffs have failed to plead facts that plausibly show that they were excluded pursuant to that policy.

Plaintiffs claim, based on how they and others around the country were treated, that the Advance Office considers anyone who expresses or is likely to express a viewpoint different from the President to be a "demonstrator" or a "protestor" within the meaning of the Advance Manual. *See* Am. Compl. ¶ 28. That is certainly a plausible contention; the Manual explicitly uses the word "supporters" in contrast and prescribes the use of rally squads with "favorable messages" and "supportive chants" to "counter" demonstrators' messages. The Manual does not define the terms "demonstrator" or "protestor," but it describes them as "people who are obviously going to try to disrupt the event" or persons "carrying signs, trying to shout down the President, or [having] the potential to cause some greater disruption to the event." Advance Manual at 34, 35. That is consistent with the ordinary definitions of these terms provided in the dictionary. *See, e.g.*, American Heritage College Dictionary 370, 1100 (3d ed. 1997).

Even if Plaintiffs were identified as demonstrators or protestors, however, there is nothing in the Advance Manual that would have dictated their ejection from the event. Plaintiffs claim that "they were excluded from the event even though neither had engaged in any action that could be considered disruptive, and there was no reason to believe that either would do so." Am.

Compl. ¶ 29.  If that is true—and the Court must assume it is when ruling on a motion to dismiss—then officials acting pursuant to the policies written in the Advance Manual should have concluded that Plaintiffs posed no potential disruption and simply ignored them.  The Manual explicitly states that "[i]f it is determined that the media will not see or hear [a group of demonstrators] and that they pose no potential disruption to the event, they can be ignored." Advance Manual at 35.  Since Plaintiffs were not visibly or audibly demonstrating at the event, there would have been nothing for the media to see or hear and, according to Plaintiffs' allegations, there was no other basis for the Advance Office staff to conclude that Plaintiffs would cause a disruption.  Therefore, Plaintiffs' allegations that they were ejected despite a complete lack of demonstration or protest activity is inconsistent with the policy expressed in the Advance Manual.

The Manual also contains no language suggesting that ejection of a ticketed guest is appropriate.  Rather, the Manual focuses on preventing likely demonstrators from obtaining tickets in the first place.[10]  The Manual also states that "[p]eople who are obviously going to try to disrupt the event can be denied entrance at least to the VIP area between the stage and the main camera platform," which suggests that demonstrators who have a ticket may be allowed into other seating areas.  Although the Manual does state that "[i]t is important to have your volunteers at a checkpoint before the Magnetometers in order to stop a demonstrator from getting into the event," the sentences preceding this statement suggest that it is focused on excluding persons who do not have a ticket for the event.  Even when a potential demonstrator has been

_____

[10] Since Plaintiffs obtained tickets to the event through their Congressman, they lack standing to challenge the ticket distribution policies in the Advance Manual.

17

identified, the Manual instructs personnel to minimize the disruption rather than eliminate it entirely. For example, where the Manual instructs Advance personnel to "take appropriate action" to squelch "a political disruption," it recommends measures such as countering demonstrators' speech with rally squads or confining demonstrators to designated protest zones. The Manual describes removal of demonstrators by security as "a last resort" option, suggesting that it is ordinarily inappropriate to eject a demonstrator from an event. Therefore, Plaintiffs' ejection does not fall squarely under any of the policies as stated in the Manual.

Plaintiffs attempt to bridge the gap between the words in the Advance Manual and what happened to them in Denver by alleging that there was a national policy to exclude people whom the White House believed might disrupt an event and that "[t]he White House Office of Presidential Advance equates anyone who expresses disagreement with the President's views as someone who might disrupt an event." Am. Compl. ¶ 30. However, it is impossible to square that allegation with the instruction in the Advance Manual that demonstrators who pose no potential disruption to the event can be ignored. If Plaintiffs can be deemed potentially disruptive demonstrators based solely on their apparent disagreement with the President's policies, then there will never be any "demonstrators" who can be ignored, since the demonstrators must, by virtue of their demonstration activity, be expressing some disagreement with the President or his policies and thus pose a threat of disruption. Therefore, Plaintiffs' allegation would render the written language in the Advance Manual meaningless, suggesting that the persons who ejected them from the event were not actually following the policy prescribed by the Manual.

Because the Advance Manual did not dictate the ejection of Plaintiffs from the President's speech based on Weise's bumper sticker, Plaintiffs have failed to plead facts that plausibly demonstrate a causal connection between their ejection and any nationwide policy created by Defendants. Based on the facts alleged in the Amended Complaint—disregarding the conclusory assertions that the Court is not required to credit—it appears more likely that Plaintiffs were ejected from hearing the President's speech by Advance Office staffers who misinterpreted, misapplied, or were ignorant of national policies regarding attendance at Presidential events. In light of the discrepancies between what is alleged to have occurred and the language in the Advance Manual, the Court must consider this to be an "obvious alternative explanation" that undermines the plausibility of Plaintiffs' policymaking liability claims. *See Iqbal*, 129 S. Ct. at 1951-52 (rejecting an inference of purposeful discrimination by high-ranking officials because of the "obvious alternative explanation" for increased arrests and detention of Arab Muslims with suspected links to terrorism); *Twombly*, 550 U.S. at 567-68 (holding that allegations of parallel conduct do not plausibly give rise to a conspiracy claim when past economic conditions provide an "obvious alternative explanation" for market behavior). Accordingly, the Court finds that Plaintiffs have failed to state a plausible claim against Defendants for policymaking liability under *Bivens*.

The Court also notes that Plaintiffs rely primarily on conclusory allegations to establish Defendants' personal involvement in developing national policies. Although Defendants undoubtedly had the formal power to formulate a national policy, Plaintiffs must establish that Defendants actually exercised that power to generate improper practices. *See Haynesworth*, 820 F.2d at 1264. In this case, the Advance Manual provided by Plaintiffs is dated October 2002,

which suggests that the challenged policies were actually in place before either Jenkins or Beyer became Director of the Advance Office. Furthermore, Plaintiffs do not allege that Defendants were aware of the other alleged incidents in which individuals were excluded from Presidential events based on their viewpoints, nor do they allege that Defendants intended for the Advance Manual to be applied in that manner. Plaintiffs do allege generally that "[t]he White House Office of Presidential Advance equates anyone who expresses disagreement with the President's views as someone who might disrupt an event," *id.* ¶ 30, but the Advance Office is not a defendant in this case. Given the limited scope of policymaking liability under *Bivens*, Plaintiffs' allegations fall short of establishing that Defendants were responsible for creating an unconstitutional policy.

For these reasons, the Court finds that Plaintiffs' well-pleaded facts do not plausibly show that either Defendant exercised his policymaking authority to promulgate an unconstitutional policy that caused Plaintiffs' ejection from the March 2005 event. Therefore, the Court shall dismiss the Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). Because the Court rules on this basis, it does not reach Defendants' arguments regarding the defense of qualified immunity or their alternative motions for summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court shall GRANT Defendant Jenkins's [34] Motion to Dismiss. The Court shall treat Defendant Beyer's [33] Motion for Summary Judgment as a motion to dismiss and GRANT it. Plaintiffs' Amended Complaint shall be DISMISSED without prejudice.

An appropriate order accompanies this Memorandum Opinion.


Date: July 13, 2011


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge